Today is Securities&Exchange Commission v. Migas, Appellate No. 22-2497, and we'll have Counsel Thiephan come forward. Good morning, Your Honors, and may it please the Court. My name is Kate Stetson, and I am here this morning in my capacity as an advisor for the Appellate Litigation Clinic at the University of Virginia School of Law, and it's my pleasure to introduce to you Jonathan Duvall and Ben Buell, who will be presenting argument as appointed amicus curiae in support of the appellant this morning. Mr. Duvall will argue first. Mr. Buell will argue rebuttal with a 10-5 split. Thank you for this opportunity. Thank you for accepting the appointment to serve as amicus curiae for us. Thank you. May it please the Court. Amicus was appointed in this case to answer three questions. First, whether Mr. Migas' address was known to the SEC. Second, whether the email service in this case comported with the Hague Convention or was prohibited by the Convention. And third, whether due process was satisfied with the service here. Let's take your first question. We know from the record that there were many efforts made to an address that had been confirmed to be Mr. Migas'. How does that address become unknown since the only thing that didn't occur is that service wasn't successful? It doesn't become unknown, is our contention, and that's the mistake that we believe that this Court made and that the SEC continues to urge here. The SEC effectively says that when a plaintiff is reasonably diligent in attempting to serve a defendant at their known address but is unsuccessful in doing so, that then the Court can effectively use 4F3 to get around the Hague Convention and ignore it entirely. That doesn't square with the text of the Hague Convention, nor does it square with the structure of the Hague Convention, and it's not supported by the cases that the SEC cites either. So what should the SEC have done? The SEC, in this case, what they could have done is they could have, as they did, served Mr. Migas' via the Hague Convention. That was returned unsuccessfully. But the Hague Convention does provide several alternatives to continue to serve someone at their known address if that service was unsuccessful. They could have, for example, served him via publication, which, as we know in our reply brief, the Swiss Rules of Civil Procedure do allow you to serve via publication a defendant if it's unreasonably difficult to serve them at their known address. And they didn't do that, we don't believe, because it would have been more time-consuming for them to do so, and they would have had to go through the Swiss Cancellal Courts, and that would have taken several months. And instead, they tried to use 4F3. But schlunk and water splash, the Supreme Court decision on the Hague Convention make pretty clear that the Hague Convention is mandatory in all cases to which it applies, and the Hague Convention is very clear in its language. It applies and it doesn't apply where an individual's address is not known, not when their location is unknown. Mr. Migas's address was stated in the complaint that the SEC initially filed against him. The complaint identified him as a resident of Verbier, Switzerland, and supplied several bank records as well as ATM withdrawals from proving that he was in Switzerland for a period of many years up to just a year before this litigation was commenced. And then they say, okay, so we weren't able to serve him, and that therefore his address becomes unknown. One thing that the SEC seems to be trying to do in this is to avoid a situation where you have someone who's avoiding or dodging service. So my question to you is, what's the way around that? That is, how is, why shouldn't we adopt a reasonable diligence test in order to avoid that? So, I think you'd have to look to the structure of the Hague Convention here, and the convention does contemplate such a situation where a defendant's address is known but service address has failed. And Article 15 of the Hague Convention gives two circumstances in which a default judgment can be entered against the defendant. Article 15.1 allows a default judgment to be entered, one, if service is accomplished by some method prescribed in the convention, or if service is accomplished by some method that's consistent with the law of the receiving state. In this case, that would be Switzerland. So even if they, so if the SEC had served him via some method that was consistent with Swiss law, for example, like publication, as I mentioned earlier, they could have satisfied that. Alternatively, 15.2, Article 15.2 of the Hague Convention allows for a default judgment to be entered when there's no certificate that's been received from the sending state, such as Switzerland, within six months and after, sorry, did you have a question? So the two scenarios that you outlined don't include email. Now it seems that there's other circuit courts that seem to suggest that email service under the Hague Convention is okay. It's almost like because it's not specifically prohibited, it must be allowed. And you seem to be maybe flipping that on its head and saying it must be specifically allowed, otherwise it's prohibited. But it seems that if, do you take a position on whether email service is permitted or are you just going to say the email wasn't good enough? Well, Judge Phipps, there is an active debate in the court circling around about whether email service is prohibited in its entirety by the Hague Convention in all cases. And Article 8 of the Hague Convention, the channels by which postal service can be achieved, there is a debate about whether anyone can ever serve anyone through the Hague Convention via email. But in this case, the court doesn't really actually need to reach that question because Swiss law doesn't allow for that, and the Swiss authority objected to the provisions of the Hague Convention that email service potentially allows, and that's what the debate's about. Switzerland objects to those in its entirety, so in no way are you ever going to be able to serve someone in Switzerland. So just to tease that out, as I understand 4F3, it talks about the phrase is prohibited under international law. And what you're saying is not a principle of international law, but an objection of one specific nation. And so it seems to me that what you're saying is because one specific nation objects, this multilateral treaty doesn't work anymore when the text of the treaty itself, I thought, correct me if I'm wrong, says prohibited under international law, not when objected to by one nation. So how do you cross that bridge? Well, we're not arguing that the Hague Convention should be modified just because of what one country does. But one country, and it depends when you serve someone via the Hague Convention what country they're in, because the law of that state and the objections that they've made to the Hague Convention will affect what service options are available under the Hague Convention for that country. Switzerland objected to several methods of service that the Hague Convention allowed, and the Hague Convention allows Switzerland to object to those, and there's still several ways to serve a defendant via the Hague Convention in Switzerland, such as going to the central  That's what we try to do in this case. And as well, you can, as 15.1 says in the Hague Convention, you can serve them via alternative means that are consistent with the state law. In this case, that would be Switzerland. It is admittedly harder to serve someone in Switzerland than it is in a lot of other countries. Email service in the United States is, in some circumstances, acceptable. But I think the court should appreciate that even in the United States, we wouldn't want a United States defendant, for example, to be able to be served by an international defendant for any reason, regardless of what United States law, if the law of the foreign state of the plaintiff says that service is okay. Wouldn't you agree, though, in Switzerland, email service seems to be only permitted if the party receiving consents to receive it by email, plus there's a number of technical requirements for the email itself, am I correct? That's correct. In Switzerland, you can only do that with consent, and importantly, in Switzerland, service needs to be accomplished by the central authority in all circumstances. It can't be accomplished by private parties. In fact, it's a crime in Switzerland for a private party to serve another private party. So the mere fact that the SEC served Mr. Migas individually, rather than going through the Swiss authorities, means that the Swiss law is going to prohibit this under the Hague Convention. I want to follow up on your reference to 15-2. You know, you said to me, there are two ways that you can do service if you have somebody who's evading 15-1 or 15-2. 15-2 says if you don't get a certificate within six months, you can get a default judgment. Is that really about the person evading, or is that about the central authority not doing something? That is, let's say you have a central authority who is very responsive and constantly gives you back certificates that say, I can't find this person, can't find this person, can't find this person. Does 15-2 help you in that situation, or do you really have to have a central authority that's not responding? I think that you need to have a central authority that's not responding, but again, the Hague alternative for this kind of case, if a central authority is being dilatory or is sending back certificates but is not actually serving anyone, the remedy would be diplomatic in this case and not legal, because the Hague Convention makes that very clear, and you don't want to be just deciding cases going against the principles of international comity. But the convention also has a provision that if a defendant, an individual who's being served who claims they never received it, have a mechanism to vacate that default, correct? Yes. Yes. And this court has a strong preference for vacating default judgments for adjudicating cases on the merits. What happens if, hypothetically, the panel decides to vacate the orders granting default judgment? What happens next? What happens in the district court? Well, you remand to the district court, and the district court can either decide, I guess, to go ahead and adjudicate this case on the merits. Mr. Migas has made clear that if he's effectively served via the Hague Convention, and again, we outlined in our brief, there are several options the SEC has available. He's happy to defend himself on the merits. So the SEC could ask for more time to effect service? Yes. Yes, Your Honor, they could. And again, if Mr. Migas is served via the Hague Convention, he rejects all the allegations that are made against him. He's happy to adjudicate this case. So I might not have traced everything out in the briefs, but I understood at least somewhere what I thought you were saying was that under these principles of international law, sometimes the fact of service doubles as a jurisdictional point. And so if you don't serve somebody abroad, then there's no jurisdiction over that person. So you kind of get a two for one in terms of no service, no jurisdiction. But you said he's happy to adjudicate the case. So is he kind of foregoing? You can waive personal jurisdiction. Do you understand him as foregoing any personal jurisdiction challenge, forfeiting, waiving that challenge? He says, I'm happy to do it if you serve me. I don't want the two for one. I just want to take the first bite, get the default done, then I'll take the merits? Sure. And I see that my time has expired. But Mr. Migas, we were appointed as amicus in this case to answer the three questions that the court asked us to. And so we don't take a position necessarily on the personal jurisdiction question. I think that that would be a question for— Well, I kind of thought that was the case. But what you said was that he would be happy to adjudicate the case in district court. And I'm not sure that he would be. Because what he might say is, hey, you didn't serve me, personal jurisdiction, I'm done. I mean, I don't necessarily need you to think what he's thinking. But I mean, when a pro se person writes something and there's a two for one in place, sometimes we give them two and not just one. No, I take the import of your question. I think that if he served in a manner that's consistent with the convention and the court honoree man does find that there's personal jurisdiction against him, I think he would be happy to adjudicate the case on the merits. That being said, I think he's deciding to stand on his rights, not sleeping on his rights. He's saying, you know, the SEC has the burden of serving people and that they need to go and do that in accordance with the relevant international treaties that exist. And that once they do so, if the court finds that they do so, they can find that they want to adjudicate this case on the merits. I see my time has expired and I'm over. Thank you very much. Thank you for your arguments. We'll hear from the SEC. May it please the court, Steven Silverman for the commission. The district court properly rejected Migas' 60B4 motion because this is not the rare case where a due process violation occurred. In fact, the court's finding that Migas' address was unknown after the commission's extensive effort to observe him proved unsuccessful, along with how this court and others have handled the common situation of serving difficult-to-locate defendants in foreign countries. But you don't have any evidence that he actually received, i.e. opened the pleading, do you? Did you say you weren't successful or the Swiss authorities weren't successful in serving at the known address? The only other means that were offered to us in the submissions were efforts at UK addresses and this email that there's nothing in the record that shows it was even opened. So how can you say that the district court had a proper factual basis to enter default here? Because the question under due process for Rule 4, Your Honor, is whether there's a reasonable likelihood that he had an opportunity to litigate the case, an opportunity to respond. And Rule F seeks to confirm delivery, not necessarily whether the person actually received it. If a process server hands a complaint to a defendant, the process server can walk away and does not have to wait and see if they opened and read the complaint. I'll stick with, I'll go with your hypothetical. A delivery to the front door of the residence, you just leave it. How is that different than just popping something to an email that we have no evidence was ever opened? Both could be, quote, delivered, but neither were received by the intended person. How would you want to focus on due process? How does that comport with due process? Well, the question is, again, whether there's some facts to indicate under the SEC v. Basel case, some facts indicate that there's a reasonable likelihood that the defendant received the complaint. And the commission provided that here by providing an address that Mr. Migas did not dispute was shared, as well as sending an email in October 2020 and receiving a delivery confirmation indicating that that email was, in fact, active. Once the commission sent that actual complaint in the summons, it again received a delivery confirmation. And the subsequent activity in that account indicates that it was, in fact, being used by individuals, an automatic reply that did not necessarily match the type of automatic reply. Did the SEC ever ask Hotmail what's up with that particular reply that was received from an email box that there was no evidence had been used for two years before the test email was sent? Did you ever go to Hotmail? There's nothing in the record that indicates that we went to Hotmail. What I will say is that our post delivery has been found satisfactory, actually, with further confirmation than the email service that's been allowed in other cases. But you would agree that our post would tell us if it was opened, correct? It can tell if an email is open, that is correct. In this case, there was not a receipt either way about whether the email was opened. But in any event, Mr. Migas acknowledges that he was on actual notice of this case. But our precedent says that that doesn't matter if he has actual notice. Actual notice is not a substitute for perfected service. I'm not sure what case you're referring to. I think under the Espinoza case, actual notice of the complaint is sufficient to- Grand Entertainment. We have some language in our decision in Grand Entertainment that says actual notice is not a substitute for perfecting service. I think that is correct, Your Honor, but not in the 60 v. 4 context. In the 60 v. 4 context, the Espinoza case says that once the defendant has sat on his rights, and so you're right in the initial matter- Sat on his rights, he reacted five days after the judgment, the three-fold judgment was entered, right? Well, he was served with the complaint in February, and then he sat on his rights for five months, and he moved back to the case- He was properly served with his complaint in February, is that what you're saying? Excuse me? You said he was properly served with his complaint in February? He was served with the complaint in February. He had actual notice of the case since July or August of the year before, but chose not to act. Can we just talk about what would constitute service? Because there was a couple glitches that at least crossed my mind in the appendix. And as I understand it, to properly serve based on his location in Switzerland, you had to send the notice in English and in French. Is that right? I don't know that under Rule 4 F3 that there was any requirement that it be sent in both English and in French. The service by alternative means under 4 F3 was consistent with 4 F3, and it was, again, reasonably likely- But we've got exhibits in the appendix that show that there seems to be service of an English document and a service in a French document. Are you familiar with those in the appendix? I'm aware of those documents. Now, I was reading these documents, and the English document says it's from the United States of Pennsylvania. The French document, I'm not going to even try French, but it says underneath it, District Est de New York, which suggests that it says that it's from a New York district. So what you seem to have served is something that got lost in translation. It says one thing in English, you're being sued in the Eastern District of Pennsylvania. It says another thing in French, you're being sued in the Eastern District of New York. That seems to be a problem if you're going to serve someone and send them a mixed message, albeit in two different languages. So do you have an answer for that? It might have been an oversight, but it strikes me that you're just pretty prejudicial, right? First step. I'm not here prepared to- The appendix page size I'm looking at are 123 to 126. That's where I'm looking. I understand. I'm not- English at 123, and I'm seeing the French at 125, and they have different courts. So if you're telling someone that you've been sued in one court in English and another court in French, it kind of strikes me as strange to say service was fine. So I'm not prepared to question or examine those documents as far as whether they were properly translated or not. What I do know is that the commission first attempted service under the Hague Convention, under 4F1, was unable to determine his address at which point the Hague Convention did not apply. And then the commission attempted service by email under 4F3 as set forth in per the court's order. And Mr. Migas has not raised an objection that the documents were somehow misinterpreted or that there was any discrepancy in the language of the documents. So I'm not prepared to address exactly whether documents were translated correctly or not. But you're trying to prove proper service, right? And so I guess what I'm saying is if you're trying to prove proper service and you send a mixed message, albeit in different languages, but you send a different message, that's kind of tough, I think, to say, gee, service was proper. We told you one court in English, another court in French. Well, again, Mr. Migas has not raised that as an objection to service. But isn't it your burden to prove proper service, not his burden to prove proper service? It's his burden to prove that service was not proper once he raises it in the 60B4 context. Once 60B4 is invoked, he has to demonstrate that there's been a violation of his personal jurisdiction or due process right. And he has failed to sustain that burden under 60B4. And if I could just circle back to Judge Switzer's reference. So let me just tease that out. What you're saying is that you're claiming that you sent him documents that he's claiming he didn't get. And now you think it's his burden to prove that the documents that you sent him that he didn't get, he has to object to the sufficiency of those documents that he didn't get instead of it being your burden? No, I'm only saying he has to invoke the objection that you're raising, Judge Gifford. As far as I'm aware, he has not raised an objection regarding the translation of documents. But he has raised an objection regarding the delivery of documents. And I believe that we have responded adequately by demonstrating that the documents were, in fact, delivered. And your evidence for that is it was acknowledged as having been received at an email box? It was acknowledged as being received. There's also additional activity on the part of that with respect to that email account that demonstrates its usage subsequently. But only by virtue of this message that we're not quite sure how it got created because the record suggests that a different hotmail address from a different situation that was inactive sent a different message. So you're asking us to infer that there was some activity on that account based on the fact that the message sent from Mr. Migas's email address was different in format and language than one that was sent to a known, you know, inactive account. That's what we were asking us to draw that inference simply from those facts. There's no others, correct? Well, the dissequent made a finding that the email was, in fact, delivered. And so what you would have to show is that that was clearly erroneous. So there's no evidence in the record that can be strung together to support the district court's finding that it was delivered. And so whether or not you want to rely on that other evidence to support the district court's finding, there's nothing that Mr. Migas brings to the court's attention to show that that finding by the district court that it was delivered was clearly erroneous. There's also the activity in July of 2021 where you see that the account was deactivated. Again, that's subsequent activity, but it does show its usage. But there was no effort by the SEC to track usage before the October emails were sent, correct? Because the record reflects that for two years, the last known usage was two years earlier than that effort to send the test email, correct? Then there's the October 2020 email to confirm that the email was still in use, correct? There was no activity for two years. In 2018 was the last time that the SEC had information about activity. And then two years later, so it's like 2018. And then in 2020, the test email was sent, correct? That's correct, Your Honor. Okay. Let me take a step back. The only way we get here is if the address is unknown, right? Correct. And... Well... Yes, Your Honor. Go ahead. I'm sorry. Is that correct? I understand certain questions related to process violations that are, you know, separate from the... I think the judge is asking about the applicability of the... Okay. That's correct. That's correct. Okay. Okay. All right. And that assumes that we adopt the reasonable diligence test, right? So as I understand, other courts have adopted this in the context of someone making an effort to determine the address. And those efforts are unsuccessful. The efforts to determine the address are unsuccessful. Not the efforts to actually serve. As far as I can tell, I don't see where you've cited a case where an address is known. There have been efforts to serve. And the efforts to serve have failed. Am I missing something? Or is there a court that has already applied the reasonable diligence test in this context? I think many cases have applied the reasonable diligence test in that context. Including this case in the Braverman... In the Braverman... This court in the Braverman case where the plaintiff had an address that the defendant put into pleadings in a civil court proceeding as her address. So there was an address that the plaintiff had. The plaintiff tried to serve that address multiple times. But the plaintiff... The defendant was not there. There's numerous cases where the plaintiffs have a, what we say, an unknown address. First of all, it's an NPO. But second, in Braverman, the current resident said, this person doesn't live here. And as a result of that, the convention kicked in and service by publication in Canada was permitted. So I don't think Braverman helps here. And let me be clear about what I mean, but similar to the facts of this case. It is the known address. There is confirmation that it is the current known address at the time they are attempting to serve. And confirmation after this that it remains the current address. Not the current resident says the person has moved or you show up to the address that is known and it's not an actual residence. What is the case that does that? So what I'm saying is that the premise is incorrect. The address was not known, Your Honor. Because the commission tried through the hate convention multiple times to serve him. And he was unsuccessful. Well, that makes an assumption that I think you're asking us to make. Attempts to serve at an address that everyone is confirmed is this person's address becomes unknown because you're not successful in your attempt to serve. No, because by the time October, excuse me, by the time the commission asked for permission to serve by email service, the commission submitted a declaration. It's a docket 15-1 paragraph 8, I believe, stating that the commission does no longer does not know Mr. Amigos' address. And that was supported by the Swiss police through stating that there's no presence at the residence and they don't even know if he's in the country at all. It's also supported by FINMA responding they have no idea about his whereabouts. The Swiss authorities said they didn't know about his travel, but they confirmed that that address was his address. Yeah, that's what I said. That was his address, but he had not been seen at that address. And the Swiss police, again, said that you. You actually have a problem of evasion, not an unknown address, but a defendant who's invading service. Isn't that really what the SEC was facing? Well, I think that was certainly present here, that there was an evasion, but I don't agree that the commission submitted a declaration saying it did not know his address. It thought it knew his address, but it did not. And the district court made the finding that the address was unknown because the district commission, in fact, did not know his address. And that finding, again, is subject to clear error review. And certainly, there's evidence in the record that shows that he was listed as an address in certain respects. But there's plenty of evidence, again, under a clear error review to support the commission's declaration and the district court's finding that that actually was not his address. And then we start talking about Swiss law. It's not even clear that Swiss law would apply because we don't even know if he's in Switzerland. He identified the UK. He chose to certify by way of the Hotmail address because you were concerned about using Swiss email in Switzerland because of some limitations. So people were certainly acting like his presence in Switzerland had some impact on some of the service decisions, right? I think certainly there's nothing wrong with the commission not wanting to run afoul of any foreign country's domestic law and not wanting to affect service that way. But there also was this concern of, is he even in Switzerland? And the commission submitted in the declaration at 15-1 that they don't know what his address is. They don't know where he's located. He identified the UK as his address in multiple filings in the UK. It was very much likely that he was in a different country. Would you agree that email service here would not have complied with Swiss law? We have not taken a position on whether email service would have complied with Swiss law because Swiss law was not at issue in this case. We affected service through Rule 4F3. And the courts ought to- Rule 4F3, as Judge Phipps was asking your adversary, about international law, comity, and things like that. We want to act in accordance with the laws of the sovereign where the person exists, correct? It's actually, the 4F3 act says that it's only allowed if it's not prohibited by international agreement. And there's no international agreement that prohibits email service because, again, the hate convention falls away. Swiss law, Swiss domestic law, is not an international agreement. So that's why we have not- So the United States can go in and contravention of a local country's laws and serve under 4F? That is feasible. In the Rio Pops case, the Ninth Circuit mentions that. Amicus mentions that in its brief. We did not want to file a Swiss law in this case because we did not, service wasn't affected under Swiss law. Service was affected under Rule 4F3. And so there's no issue there. Let me just ask a question on kind of the SEC's role in getting extensions of time and whether that affects whether the address was known. It looks to me like the time to serve was running out and that the SEC had to move for several extensions, maybe two or three. But on the first one, if I have this correctly, it says, you know what, we can't seem, you know, in Switzerland, we know the address. We want some more time. The service deadline was late June. And then there's an affidavit from one of your colleagues at the SEC that says, we know his address. The district court believes that. And the district court says, you get until October. So it strikes me, though, that if the time to serve was about to expire and the only reason that you started down the path of getting extensions was to tell the court that you knew his address, it seems really weird to then come back around and say, oh, you know what, change of mind. We don't know the address, but thanks for all the extensions you gave us predicated on the fact that we told you, the court, that we knew the address. I don't know how you can ask for a series of extensions that start with the representation that we know the address. And then after those play out, say, nope, we were wrong. We didn't know the address. That's a good tip. I see my time's run out. But I don't think the facts change, Your Honor. As early as in April, there is a violence. But my point is, your extension was predicated on knowing the address. If the facts change, it seems that you have to come back to the court and say, hey, maybe our extension shouldn't have been granted. Maybe this should have just done. Maybe we should refile the suit. Maybe we should do all these other things because we didn't get done. The reason that we told you to get all our extensions wasn't true. And it strikes me that you say later, oh, hey, we now know. But you never went back and said, as of that date, the date of the first extension, it wasn't true. You say at the end date, we don't know. But doesn't the first extension matter? Well, everything that was stated to get the first extension was true at the time that the first extension was requested. The commission believed that it knew his address at the time it requested the first extension. And then it turns out that it did not know his address. And so the facts change. But the extensions were all predicated on known address. It seems that you, my point is, doesn't it strike you as a little bit maybe, you want to talk about substantial justice and notions of fair play, it strikes me that if you get a series of extensions based on we know this guy lives here, and then to use all those and then say, oh, we want to completely switch gears and use a different method of service, that's not exactly traditional notions of fair play and substantial justice, is it? I don't think that every extension that the court, excuse me, the commission asked for is predicated on the fact that the first extension was backdated. Well, at least the first one was. The first one was. The first one was based on that. And then the facts changed. And in fact, the commission requested extensions the second and third time because it turns out it was not able to find his address. So there's nothing improper about or nothing inaccurate about the declarations in support of those extensions at that time. The district court was well informed that at that point, the Swiss police had advised that he was not even located perhaps in Switzerland. So I guess I don't think that there's no shifting or playing of games here. The commission thought it knew his address. As time went on, it turned out the commission did not know his address. Based on that, at that time, it needed more time. And then it needed even more time to seek alternative service in the UK or by email. But there was never no sort of subterfuge on the part of the commission to get the extension. So I guess my question is just this. The buzzword that everyone knows for due process is traditional notions of fair play and substantial justice. Do you think getting a series of extensions saying we know his address and then turning around saying now with the benefit of those extensions, we don't know his address and we want to do something different, you think that's consistent with traditional notions of fair play and substantial justice? Well, yes. If you thought you knew his address at the earlier time, and that's why you're trying to effect service at that earlier time, he said he was out of the country. And so an extension was asked based on that. And then subsequently, because he was not able to be contacted, the commission determined they didn't know his address. And so it was certainly fair and with substantial notions. So how long exactly did the SEC have to serve him? Excuse me? How long in terms of months, years and months did it take from your view when the action was filed until he was eventually served? Well, 10 months. The commission had, I mean, that goes towards the amount of diligence and reasonable efforts that the commission undertook to serve him. 10 months of effort, contacting multiple agencies, government agencies, and really trying to locate Mr. Migas to effect service on him. It comes to the point, if this was not sufficient to effect service, then what is? The commission turned over every stone and did everything it could, again, within reason under the reasonable diligence test, to personally serve Mr. Migas, which is consistent with the purpose of the Hague Convention to effect efficient and quick service on individuals in foreign countries. If the panel decides to vacate, hypothetically, the default and default judgment and vacates the order denying the Rule 60b-4 relief, what happens? What's the SEC going to do to effect service? Well, I don't. It would go back to the district court, and I don't know. That would be up to your trial team, Your Honor. We have not reached a determination. It would obviously depend, in part, on what this court writes, and it would be up to the trial team. Respectfully request that the court affirm the decision below. Thank you for your arguments. We'll hear rebuttal. Good afternoon. The clearest path for this case is via the Hague Convention. Mr. Migas's address was known to the commission for years prior to ever attempting service, and then once that threshold question is resolved, the answer is pretty easy. To your point, Judge Phipps, about email service under the convention, the only way to serve somebody in Switzerland is via the Swiss central authority. So there is this split of authority among the district courts about does the Hague Convention prohibit email service, the Article 10 objection, et cetera. It's interesting, but you don't have to reach that issue in this case, because for the simple fact that the attempted service was done through a private entity, or I should say a non-Swiss entity. I want to address the Braverman case, because to your point, Judge Schwartz, it does support our position, not the commission's. The defendant, or excuse me, the plaintiff in Braverman went to the defendant's residence. They said she moved to Russia. They went to the defendant's son. She said moved to Russia. Went to the Canadian postal authorities. They said she's no longer here. Look at our case. The FINMA, we know from JA92, confirmed that Mr. Migas was still registered at the Verbeer address. They confirmed that he was still active in local civic organizations there. So you need actual evidence, affirmative evidence, that somebody has moved before you can ever make a determination that somebody's address is not known. Do you agree that if your position is that the SEC knew that address and these other entities confirmed that that was the accurate address, yet the Swiss authorities were unsuccessful each and every time they went, and they were good foreign colleagues in helping to try to accomplish that, what is the SEC supposed to do? One could infer there was intentional evasion of service. What is the SEC to do? To be very sure, sometimes serving somebody, serving a service process in an international context is difficult. It's not supposed to be easy. I think we have to resist the background presumption that there had to be some way to efficiently serve Mr. Migas. We have a convention that tells us different things. We know that one of the things we can do is if the two contracting states agree, use local law. So what is it that the SEC should have done under these circumstances if what you're describing is more evasion, not an unknown address? And I just want to piggyback off that a little bit because your colleague was asked a similar question. What if this is a situation where you have evasion? Is there some other way to serve? And he referenced 15-1. And so do you have the same understanding of 15-1? Are you telling us that service by publication is not possible? No, it absolutely is. As we explained at page 9 of our reply brief, Switzerland's provision for service by publication addresses this exact situation. That is when somebody's whereabouts are unknown. And if the Swiss central authority had affected service by publication, as that provision makes clear, service would have been deemed effective on the date of publication. And then the district court could have proceeded to a default judgment under Article 15-1 because service would have been done in a manner that was consistent with the convention because it was consistent with Swiss law. Your position is evasion, is that prevents evasion because you can serve through that way to prevent evasion. It's not just unknown. I thought I heard you say unknown. Yes, Your Honor, that is our position. And we know also from the record that from JA-141 and 142, that the SEC requested from the Swiss authorities additional methods to serve Mr. Medias consistent with Swiss law. That memo has never made it into the record. I actually had a question about that. If anybody's ever seen that memo? We've certainly never seen it. And the SEC has never brought it to our attention in this litigation. Do you have no information from the SEC by representation as to what that memo said from the Swiss authorities? No, Your Honor. Of course, that memo could have potentially said that service by publication was available. Instead, what the SEC did was essentially skip the line and go to the district court and ask for alternative service under Rule 4F3. I want to address a couple of points, too, about the notice issue. That issue, if you find that Mr. Medias' address was known and therefore the convention applies, you don't have to reach the notice issue. But I agree with Your Honor that the STARS Entertainment Group case that we cite on page 22 of our reply brief is the proper case for the proposition that actual notice in this context does not defeat a due process claim. I also want to address the opposing counsel's contention that the district court made a factual finding about Mr. Medias' address. JA-42 is the extent of the district court's reasoning on this hate convention issue. And all it said, it didn't say that Mr. Medias' address was not known. It simply said that the SEC's attempts to serve Mr. Medias were futile. As we explained, that's the wrong legal standard. So we disagree that that decision, if there was one, should be reviewed under the clear error standard. There are no further questions. We ask the Court to reverse. Okay. Thank you. Thank you. We thank counsel for both parties for their very, very helpful argument and briefing. And the matter will, the Court will take the matter under advisement. And the Court, again, thanks UVA for serving as amicus in this case. And we wish those who argued good luck with the bar. Someday you'll get to take the oath you just witnessed.